### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

#### CASE NO._____

UNITED STATES OF AMERICA,

        **Plaintiff,**

v.

FORTY-EIGHT (48) PIT BULL-TYPE DOGS,

        **Defendants *In Rem*.**

_____/

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America (the "United States"), by and through its undersigned counsel, alleges upon information and belief as follows:

### I.    NATURE OF THE ACTION

1. This is a civil action for forfeiture *in rem*, pursuant to 7 U.S.C. § 2156(e), the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the Federal Rules of Civil Procedure, to forfeit to the United States dogs involved in a violation of the federal animal fighting venture prohibition, in violation of 7 U.S.C. § 2156, including any offspring.

2. The dogs subject to forfeiture *in rem* include thirty-six (36) dogs seized on or about January 14, 2025, from a residence located on Southwest 10th Terrace, Deerfield Beach, Florida 33441 (the "Defendant Fighting Dogs"), and twelve (12) offspring subsequently born (the "Defendant Offspring") (collectively, the "Defendant Dogs"). The Defendant Fighting Dogs are as follows:

(i)        **USM-1937**: a red, male pit bull-type dog;

(ii)       **USM-1938**: a tan, male pit bull-type dog;

(iii)      **USM-1939**: a black, female pit bull-type dog;

(iv)      **USM-1940**: a red, male pit bull-type dog;

(v)       **USM-1941**: a black, female pit bull-type dog;

(vi)      **USM-1942**: a black, female pit bull-type dog;

(vii)     **USM-1943**: a black, female pit bull-type dog;

(viii)    **USM-1944**: a black, female pit bull-type dog;

(ix)      **USM-1945**: a tan, male pit bull-type dog;

(x)       **USM-1946**: a tan, female pit bull-type dog;

(xi)      **USM-1947**: a red, male pit bull-type dog;

(xii)     **USM-1948**: a red, male pit bull-type dog;

(xiii)    **USM-1949**: a red, female pit bull-type dog;

(xiv)     **USM-1950**: a black, female pit bull-type dog;

(xv)      **USM-1951**: a black, male pit bull-type dog;

(xvi)     **USM-1952**: a black, female pit bull-type dog;

(xvii)    **USM-1953**: a red, male pit bull-type dog;

(xviii)   **USM-1954**: a tan, female pit bull-type dog;

(xix)     **USM-1955**: a tan, female pit bull-type dog;

(xx)      **USM-1956**: a black, female pit bull-type dog;

(xxi)     **USM-1957**: a black, male pit bull-type dog;

(xxii)    **USM-1958**: a tan, male pit bull-type dog;

(xxiii)   **USM-1959**: a black and white, male pit bull-type dog;

(xxiv)    **USM-1960**: a tan, female pit bull-type dog;

(xxv)     **USM-1961**: a tan, male pit bull-type dog;

(xxvi)    **USM-1962**: a black, male pit bull-type dog;

(xxvii)   **USM-1963**: a black, male pit bull-type dog;

(xxviii)  **USM-1964**: a tan, female pit bull-type dog;

(xxix)    **USM-1965**: a red, female pit bull-type dog;

(xxx)     **USM-1966**: a red, female pit bull-type dog;

(xxxi)    **USM-1967**: a red, female pit bull-type dog;

(xxxii)   **USM-1968**: a tan, male pit bull-type dog;

    (xxxiii)  **USM-1969**: a tan, male pit bull-type dog;

    (xxxiv)  **USM-1970**: a brindle, male pit bull-type dog;

    (xxxv)  **USM-1971**: a tan, female pit bull-type dog; and

    (xxxvi)  **USM-1972**: a black, female pit bull-type dog.

The Defendant Offspring, that is, offspring of Defendant Fighting Dog **USM-1964** all born on or about February 26, 2025, are as follows:

    (xxxvii)  **USM-1964A**: a black and white, male pit bull-type dog;

    (xxxviii)  **USM-1964B**: a black and white, male pit bull-type dog;

    (xxxix)  **USM-1964C**: a black and white, *stillborn* pit bull-type dog;

    (xl)  **USM-1964D**: a brown and white, female pit bull-type dog;

    (xli)  **USM-1964E**: a brown and white, male pit bull-type dog;

    (xlii)  **USM-1964F**: a black and white, female pit bull-type dog;

    (xliii)  **USM-1964G**: a brown and white, female pit bull-type dog;

    (xliv)  **USM-1964H**: a tan and white, male pit bull-type dog;

    (xlv)  **USM-1964I**: a black, brown, and white, male pit bull-type dog;

    (xlvi)  **USM-1964J**: a black and white, male pit bull-type dog;

    (xlvii)  **USM-1964K**: a black and brown, male pit bull-type dog; and

    (xlviii)  **USM-1964L**: a black and white, female pit bull-type dog.

3.    Defendant Fighting Dogs USM-1937 through USM-1972 were seized on or about January 14, 2025, from the backyard of the above-referenced residence located in Deerfield Beach, Florida. At the time of seizure, USM-1956, USM-1957, and USM-1958 were puppies, approximately twelve weeks of age.

4.    Additionally, Defendant Fighting Dog USM-1964 was pregnant at the time of seizure, and subsequently delivered twelve (12) puppies while in the custody of the U.S. Marshals Service. As referenced above, the offspring of USM-1964 were given U.S. Marshals Service identification numbers USM-1964A through USM-1964L, which are the Defendant Offspring.

5.      Except for Defendant Dogs USM-1937, USM-1944, USM-1972, and USM-1964C, the Defendant Dogs currently are in the custody of the U.S. Marshals Service and being cared for by U.S. Marshals Service contractors.[1]

6.      The estimated costs incurred in caring for the Defendant Dogs from the date of seizure to the date of filing of this complaint is approximately $500,000 and, as explained in more detail below, is recoverable from any owner appearing in this forfeiture proceeding. *See* 7 U.S.C. 2156(e); *infra* ¶ 75.

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 7 U.S.C. § 2156(e).

8.      This Court has *in rem* jurisdiction over the Defendant Dogs. *See* 28 U.S.C. §§ 1345, 1355(b).

9.      Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida. *See* 28 U.S.C. § 1355(b)(1)(A).

[SPACE INTENTIONALLY LEFT BLANK]

---

[1] Unfortunately, USM-1972 tested positive for Parvo virus and succumbed to its injuries, passing away shortly after being seized by law enforcement. USM-1937 was extremely aggressive and in such bad health that U.S. Marshals Service contractors had to euthanize the dog. USM-1944 passed away while in the care of U.S. Marshals Service contractors. And USM-1964C was stillborn. Nonetheless, the United States still seeks to forfeit these dogs because, in rare circumstances, some courts require the government to pay claimants the value of property if the government has lost property that was seized and never forfeited.

## III.   FACTUAL ALLEGATIONS

At all times material to this action:

### A.   <u>Dog Fighting and The Animal Welfare Act</u>

10.   Dog fighting is a horrific and violent contest in which two dogs—that are bred and conditioned for fighting—are released by their owners or handlers in a controlled environment to attack each other and fight for the purposes of entertainment or gambling. Dogfights often occur in rectangular enclosures with low walls that Dogfighters refer to as a "pit" or "box." The enclosures can be constructed with plywood and dimensional lumber to allow for transport and convenient assembly/disassembly. A dog fight usually ends when a handler "picks up" the dog, withdrawing it and forfeiting the match, or when one dog is mauled to death.

11.   The federal Animal Welfare Act, 7 U.S.C. §§ 2131, *et seq*., prohibits animal fighting ventures. 7 U.S.C. § 2156. An "animal fighting venture" is defined as "any event, in or affecting interstate or foreign commerce, that involves a *fight conducted or to be conducted* between at least 2 animals for purposes of sport, wagering, or entertainment . . ."—except for the purposes of hunting. *See* 7 U.S.C. § 2156(f)(1) (emphasis added).

12.   Not only is it illegal to knowingly sponsor or exhibit an animal in an animal fighting venture, but it is also illegal to knowingly attend an animal fighting venture and to knowingly sell, buy, possess, train, transport, deliver, or receive an animal for purposes of having the animal participate in an animal fighting venture. *See* 7 U.S.C. § 2156(a)(1), (a)(2)(A), (b).

13.     Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively.

14.     They maintain contact with other dog fighters around the country and can generate substantial income from gambling on dog fights and from the sale and breeding of fighting dogs.

15.     It is common for successful dog fighters to sell Champion and Grand-Champion dogs to other dog fighters and to breed and sell puppies from Champions and Grand Champions to other dog fighters.

16.     Dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the "bloodline" of these dogs for fighting purposes.

17.     Dog fighters, dog fighting trainers, and fighting dog breeders, such as the individual described *infra* paragraphs 36 to 41, keep such dogs solely for fighting purposes and in furtherance of dog fighting ventures.

18.     Pit Bull-type dogs are the most prevalent type of dogs used in dog fighting ventures. This is due to their short coat, compact muscular build, and the

aggressive temperament that some Pit Bull-type dogs exhibit towards others.

19.    It is common practice for those involved in training and exhibiting fighting dogs to possess several dogs at one time. This practice is followed for several reasons. Dog fighters maintain a stock of dogs at different weights and sexes because, in dog fights, dogs are matched against other dogs of similar weight and sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight and sex meets the requirements for a match being solicited by an opponent.

20.    Dog fighters maintain multiple dogs to selectively breed, sell, and fight dogs displaying certain fighting traits or otherwise advance a particular dog fighting bloodline. Possessing multiple dogs increases the prospects of owning a dog who will excel at fighting and become a Champion or Grand Champion.

21.    Dog fighters routinely test and evaluate their dogs to determine those that exhibit aggressive behavior and those that exhibit fighting prowess, including against the other dogs they own.

22.    The most common way that a dog fighter tests a particular dog to ascertain whether the dog is "game" is to "roll" the dog. A "roll" is a dog fight conducted for purposes of "gametesting" rather than for wagering. "Roll" fights generally last from five to fifteen minutes, at which point the handlers usually stop the fight. However, "roll" fights can result in serious injury or death to one or both dogs.

23.    Further, dog fighters must possess an inventory of dogs because fighting dogs often die or are severely injured during fights.

24.     Dogs that lose fights or fail to show "gameness" are often killed. It is common for losing dogs to be killed in cruel, torturous, and inhumane ways as punishment.

25.     Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then undergoes a conditioning process dog handlers refer to as a "keep."

26.     A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including: treadmills used to run and exercise the dogs away from public view; weighted chains and pulling devices used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; water-based training such as tethering a dog to a cable running across a pool; and the administration of drugs, legal and illegal, including dietary supplements and steroids, to build muscle mass and aggression. Live animals and animal pelts are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

27.     Those types of training equipment and drugs are used in furtherance of animal fighting ventures because such regimen increases the dog's fighting prowess; thus, increasing the odds of winning a dog fight.

28.     Commonly, individuals operating and/or participating in dogfighting ventures maintain pedigrees, books, records, ledgers, and journals relating to the possession, purchase, transportation, sale, breeding, and training of fighting dogs and

their offspring. These materials exist in both hard- and electronic-copy and are frequently transmitted through the Internet on websites, forums, and social media. The "pedigree" of a fighting dog generally shows the dog's name, with reference to the dogfighting "kennel," as well as breeding lineage sometimes going back multiple generations, with references to the number of fights won by that dog and its predecessors. Pedigrees are important in the dogfighting "industry" because they allow dogfighters to maintain information on whether a particular "bloodline" or breeding combination resulted in desired fighting traits.

29.     Dogfighters also post fighting dog pedigrees on certain websites that are used as a repository for breeding information to prove and verify the lineage of their fighting dogs, opponents their dogs will be fighting against, or dogs the dogfighters are considering buying or breeding with their dogs. The pedigree for each dog often contains an indicator of how many fights the dog has won, whether the dog is a "Champion" or a "Grand Champion," the breeding history of the dog, and indicators of the number of fights won by that dog's bloodline. Pedigrees also contain a field for "Breeder and "Owner" information, and sometimes contain pictures of the dogs.

30.     Dogfighters also may keep detailed ledgers and journals that specifically depict how certain dogs performed during a particular fight, together with the duration and outcome of fights.

31.     Dogfighters today tend to communicate with each other via text message, social media websites such as Facebook, email, or website chat rooms dedicated to "game dogs." Both public and private groups (*i.e.*, Facebook

groups/communities pages) dedicated to dogfighting exist.  Dogfighters routinely "hook" matches and exchange documents, expertise, photographs, or videos relating to dogfighting activities via email, text messages, social messaging applications such as WhatsApp, and other electronic means. Social media websites and applications offer individuals who engage in animal fighting with the ability to communicate using text messages and audio calls, transmit and receive pictures and videos of animal fighting, and establish and widen animal fighting networks. For example, dogfighters exchange photographs and videos of dogs to demonstrate a dog's build, gameness, and other fighting qualities, when soliciting or advertising a dog for purposes of breeding, buying, or arranging a fight.

32.     Dogfighters who maintain successful or high-potential fighting dogs do so for long periods of time so that they can continue to profit off those dogs in future dogfights or from selling offspring or breeding rights. The more fights a dog wins, the higher that dog's value, for either offspring, breeding, or sale to another dogfighter.

33.     Some dogfighters are selective about who they will sell fighting dogs to because the success of that dog in the fighting ring will reflect on the seller whose bloodline is represented by the dog. A dog that produces multiple offspring that go on to be "Champions" (*i.e.*, winning three or more dogfights) is bestowed the "Register of Merit" ("ROM") title. This provides incentive to the seller to sell dogs to capable dogfighters, with the intention that the dogs will be fought successfully.

34.     Finally, dogs that have been fought may have scars, puncture wounds, swollen faces, and/or mangled ears, among other wounds. Scars from organized dog

fights are commonly found on the face and front legs, as well as on hind ends and thighs.

35.     Whether dogs are injured during an organized dog fight or a roll fight, or is suffering from parasitic infections, dog fighters often attempt to treat illnesses and mend the injuries of their dogs on their own rather than seek veterinary attention—which may raise suspicion regarding the cause of the illness or injuries. Thus, it is common that dog fighters and breeders keep veterinary supplies where dogs involved in dog fighting are being kept. Common veterinary supplies include, but are not limited to: deworming medications; injectable medications; syringes; healing ointment used to treat cuts, lacerations, scrapes, burns, and sores; and wound dressing, among other supplies. These types of medical supplies are necessary to ensure fighting dogs are healthy enough to participate in an animal fighting venture.

### B.      **Alex Eugene Benefield is a Dog Fighter, Dog Fighting Trainer, and Breeds and Sells Dogs for the Purpose of Participating in an Dog Fighting Venture**

36.     Alex Eugene Benefield ("Benefield") is a dog fighter, dogfighting trainer, and breeds and sells fighting dogs for purposes of participating in an animal fighting venture in the Southern District of Florida and elsewhere.

37.     On September 16, 2025, Benefield pleaded guilty to two counts of possessing, training, and receipt of a dog for use in an animal fighting venture, in violation of 7 U.S.C. § 2156(b). *See* Minute Entry, Change of Plea Hearing, *United States v. Alex Eugene Benefield*, Case No. 25-CR-60017-RS (S.D. Fla.), Dkt. No. 61; *see also* Factual Proffer, Dkt. No. 63. As part of his plea agreement, Benefield agreed

to assist the United States, and not to contest or impede, the forfeiture of the Defendant Dogs. *See* Plea Agreement ¶ 11, Dkt. No. 64.

38.     Benefield resided at a residence located on Southwest 10th Terrace, Deerfield Beach, Florida 33441 ("Benefield's Residence")—the location from where the Defendant Fighting Dogs were seized. As explained below, this is the location where Benefield kept the Defendant Fighting Dogs, and trained them, for participation in dog fighting ventures.

39.     From at least in or around early 2023 and continuing to January 14, 2025, Benefield knowingly possessed and trained a pool of fighting dogs, including the Defendant Fighting Dogs, for the purposes of having them fight, and/or otherwise participate, in an animal fighting venture (*i.e.*, a dogfighting event conducted and/or to be conducted) in the Southern District of Florida and elsewhere, in violation of 7 U.S.C. § 2156(b).

40.     Moreover, during the same time period, Benefield knowingly bred and sold fighting dogs for purposes of exhibiting them, and/or otherwise having them participate, in an animal fighting venture, in violation of 7 U.S.C. § 2156(b).

41.     In recorded conversations, a few examples of which are included below, Benefield is heard talking about his participation in animal fighting:

        a.     On or about February 7, 2023, after hearing that another dogfighter ("Individual 1") was complaining about him, Benefield defended his reputation as a dogfighter and trainer to a confidential human source (the "CHS"). During a recorded meeting at Benefield's Residence, Benefield told the

CHS that he had won six dogfights for Individual 1, stating: "He [Individual 1] lost them two, right? [. . .] When you get a chance, [. . .] damn [. . .] you [CHS] say you [Individual 1] lost two with Black [Benefield], but you didn't told me you had just won six straight with the man." Benefield complained: ". . . I win you six straight and then you lose two and now it's my fault."

   b.     During the same meeting, Benefield called another dogfighter ("Individual 2") on his cell phone to defend his reputation. Benefield also asked Individual 2 about other dogfights, and indicated his readiness and reliability to participate in future dogfights. Benefield said: "when have I never not shown up, man? [. . .] I ain't did that yet, partner. [. . .] I've been all around the world. [. . .] I found out two weeks of, or the week of, hey, we are goin' to Mississippi [. . .] I get it in gear and get there."

   c.     On or about December 14, 2024, Benefield met with the CHS again at Benefield's Residence. During the recorded meeting, Benefield discussed breeding dogs, including the offspring of a dog that he previously owned. When the CHS asked if Benefield had sold "Blueface," Benefield told the CHS: "Been sold [. . .] that's his son. He another murderer; he done killed two, or three himself; his son, Capone. Blueface's son, is what they talking about now."

   d.     During the same meeting, Benefield also complained about a recent dogfight, in which he forfeited the match because the opponent's dog attacked the face of Benefield's dog rather than targeting the chest and throat.

In the backyard of Benefield's Residence, Benefield had another person hold up the dog that lost the fight so the CHS could inspect the dog's chest, throat, and face. Benefield told the CHS: "That's why I broke it up because they going to fuck my [dog's] face up. She ate my [dog's] face up real good. They going to fuck my dog up. So, I didn't want that [. . .] she too weak to do anything. [. . .] I said, you know bro? Let's pay the people their money."

### C.   The Defendant Dogs are Animals Involved in an Animal Fighting Venture, in violation of 7 U.S.C. § 2156(b)

#### i.   *Law Enforcement Executed a Federal Search and Seizure Warrant at Benefield's Residence on January 14, 2025*

42.   On or about January 14, 2025, law enforcement executed a federal search and seizure warrant at Benefield's Residence.

43.   In the backyard of Benefield's Residence, law enforcement discovered 36 dogs, which are the Defendant Fighting Dogs USM-1937 to USM-1972.

44.   In Benefield's backyard, law enforcement discovered approximately 39 makeshift cages constructed from crude materials such as rusty metal fencing, plywood, chain-link fencing. A site map drawn by law enforcement is depicted below.



45.     Consistent with dogs that are possessed and/or trained for participation in an animal fighting venture, all 36 of the Defendant Fighting Dogs were found outside in the backyard, restricted within the makeshift cages. Further, law enforcement observed the Defendant Fighting Dogs kept and maintained in conditions indicating that they were involved in an animal fighting venture and not kept as pets or for purposes of hunting.

46.     For example, each Defendant Fighting Dog, with the exception of three puppies, was restrained or housed in a separate cage. As previously mentioned, this is commonplace for individuals involved in dog fighting ventures because it keeps the dogs from socializing and/or fighting each other.

47.     The below photographs were taken in the backyard of Benefield's Residence and depict a few of the makeshift cages and the horrendous conditions in which the Defendant Fighting Dogs were kept.

[SPACE INTENTIONALLY LEFT BLANK]











ii.   ***The Backyard of Benefield's Residence Contained Equipment Commonly Used for Training and Evaluating Dogs for the Purpose of Participating in a Dog Fighting Venture***

48.    While executing the search of the backyard of Benefield's Residence, in the same area housing the Defendant Fighting Dogs, law enforcement discovered training equipment used to condition dogs for dog fighting.  As mentioned above, a dog's endurance and strength is important to dogfighters because it helps increase the dog's fighting prowess and, thus, increasing their odds of winning a dog fight.

49.    As shown in the photograph below, law enforcement found a "carpet mill" in Benefield's backyard.

[SPACE INTENTIONALLY LEFT BLANK]



50.     Carpet mills are endurance training devices whereby one of the fighting dogs is chained to one arm of the carpet mill and an "agitator"—often times a bait dog/animal—is chained to the other arm, allowing the fighting dog to chase the agitator around in a circle. For example, law enforcement discovered a caged racoon in Benefield's backyard, which is depicted in the photograph below.



51.     Near the same area of Benefield's backyard as the carpet mill, law enforcement found a "spring pole," which is a spring suspended in the air and used by dogfighters as part of a dog's training regimen. Dogfighters and dog fighting

trainers use spring poles to strengthen the dog's jaw grip, which is an important element in dog fights. To use the spring pole, dogfighters and dog fighting trainers will force dogs to bite the spring pole, which suspends the dog in the air—forcing the dog to hold its body weight by only its jaw. Below is a photograph depicting the spring pole from the backyard of Benefield's Residence.



52.     Law enforcement also discovered a hanging scale set up in a designated area of Benefield's backyard. Dogfighters commonly use hanging scales to weigh the dogs to determine whether the dog meets the agreed upon fighting weight for a particular dogfight. A photograph of the designated weighing area is below.

[SPACE INTENTIONALLY LEFT BLANK]



53.     In Benefield's backyard, law enforcement also discovered a training shed with four treadmills inside. The treadmills had chains installed to force a dog to continue training. The treadmills also had plywood walls installed, allowing Benefield to train multiple dogs at the same time while keeping the dogs from fighting each other.  Photographs showing three of the treadmills found in Benefield's shed are included below.

[SPACE INTENTIONALLY LEFT BLANK]





54.     At least two of the treadmills found in the training shed were manufactured outside the State of Florida by Icon Health & Fitness, Inc. headquartered in Logan, Utah.

55.     Also inside the training shed and near the treadmills, law enforcement observed multiple weighted collars and vests in varying styles. People training dogs for dogfighting often use weighted collars and vests to increase the dog's neck strength and increase the dog's endurance—both important elements for winning a dog fight.



56.     Law enforcement also discovered large amounts of dog food in Benefield's backyard, some of which was manufactured outside the State of Florida. For example, at least one of the bags of dog food found in the training shed, which was labeled "Victor Super Premium Dog Food," was produced in Texas. In another example, a bag of Purina dog food found elsewhere in Benefield's backyard was manufactured in St. Louis, Missouri. As with any live animal, food is essential to maintaining a fighting dog's health, ensuring its availability for use in a dog fighting venture.

57.     Additionally, law enforcement found slat mills next to Benefield's backyard training shed. Slat mills are manually powered treadmills that do not require electricity to function. Dogfighters often use slat mills as part of a fighting dog's training regimen to gain the endurance needed to survive an illegal dog fight. At least one of the slat mills found in Benefield's backyard was manufactured outside the State of Florida by Dog Trotter USA in Winchester, Virginia.  A photograph depicting Benefield's slat mills is below:



### iii.   *Benefield's Residence Contained Veterinary-Type Medicines, Medical Supplies, and Other Supplements*

58.     Inside Benefield's Residence, law enforcement discovered veterinarian-type supplies, ointments, needles, syringes, and medications typically used to treat and/or prevent various canine injuries and parasitic infections, such as hookworm, whipworm, and heartworm. Many of the items were manufactured outside the State of Florida and transported thereto in interstate commerce. For example, Benefield had the following dog-related medications:

a.      a bottle of Praziquantel for injection, which is used to treat parasitic worm infections, and which was manufactured by Bimeda, Inc. in LeSueur, Minnesota;

b.      a vial of CDV-CAV2-CPIV[2] vaccine with an expiration date of on or about October 25, 2025, which was manufactured by Boehringer Ingelheim Animal Health, headquartered in St. Joseph, Missouri;

c.      a box of NexGardPlus dog medication, which is used to treat dogs for fleas, ticks, heartworm disease, roundworms, and hookworms, and which was also manufactured by Boehringer Ingelheim Animal Health;

d.      a box of Safeguard canine dewormer, which was manufactured by Merck, headquartered in Rahway, New Jersey;

e.      tubes of Simplera, which is used to treat dog ear infections, and which was manufactured by Medtronic, headquartered in Dublin, Ireland, and

---

[2] Canine Distemper Virus (CDV); Canine Adenovirus (CAV-2), Canine Parainfluenza (CPIV).

Minneapolis, Minnesota; and

f.      a bottle of VetOne vitamin K1 sterile solution for injection, which was manufactured by Sparhawk Laboratories, Inc., headquartered in Lenexa, Kanas.

59.     Additionally, law enforcement discovered a 2.5-pound tub of AniMed DMG 2000 powdered dietary supplement meant for horses. This supplement promotes athletic performance, energy, stamina, endurance, and muscle recovery— all of which is important for producing a winning fight dog.

60.     According to records obtained by law enforcement, Benefield ordered the tub of AniMed DMG 2000 on or about January 11, 2025, from Chewy.com, an e-commerce website for animal products. The box, which was shipped from Pennsylvania, was found at Benefield's Residence the day of the search.

61.     These types of medicines, supplements, and other supplies are essential to maintaining the Defendant Fighting Dogs' health, endurance, and muscle recovery, thereby ensuring that each dog is healthy enough to participate, and win, an illegal dog fight.

### iv.      *The Defendant Fighting Dogs' Health Conditions are Typical of Involvement in a Dog Fighting Venture*

62.     The health and condition in which the Defendant Fighting Dogs were found was not consistent with that of pet dogs of comparable age. In fact, all the Defendant Fighting Dogs showed signs of involvement in dogfighting, including varying degrees of scaring, open wounds, malnourishment, parasitic infections, and various other injuries typical of involvement in dogfighting.

63.     Specifically, approximately 31 of the Defendant Fighting Dogs were found malnourished.

64.     Approximately 20 of the Defendant Fighting Dogs exhibited symptoms of parasitic infections such as hookworm, whipworm, parvo virus, and giardia—a parasite that causes intestinal infections marked by cramps, bloating, nausea, and diarrhea.

65.     Several of the Defendant Fighting Dogs exhibited dental issues, such as worn or broken teeth, which is a common injury among fighting dogs because the injury is associated with bite strength training and latching onto an opponent during an illegal dog fight.

66.     Finally, all of the Defendant Fighting Dogs exhibited scaring and/or open wounds consistent with dogfighting, including scars and/or open wounds located on the face, neck, and legs.

67.     For example, as depicted in the photograph below, which was taken the day of the search, Defendant Fighting Dog USM-1963 has significant scaring on its face and legs, some of which appear to be open puncture wounds consistent with injuries caused by dogfighting.

[SPACE INTENTIONALLY LEFT BLANK]



68.     In another example, Defendant Fighting Dog USM-1955 is missing part of its lip and nose—which is consistent with injuries caused by dogfighting. A photograph of Defendant Fighting Dog USM-1955 is below:



69.     Similarly, the photograph below shows Defendant Fighting Dog USM-1952 appears to have an open wound on its tail:



**v.     *Defendant Fighting Dog USM-1964 Gave Birth to 12 Puppies***

70.     On or about February 26, 2025, Defendant Fighting Dog USM-1964 gave birth to a total of 12 puppies—8 males and 4 females—that are identified as Defendant Offspring USM-1964A, USM-1964B, USM-1964C, USM-1964D, USM-1964E, USM-1964F, USM-1964G, USM-1964H, USM-1964I, USM-1964J, USM-1964K, USM-1964L. Eleven puppies were born naturally with no complications, except USM-1964C, which was stillborn.

71.     The gestation period for dogs typically ranges from approximately 58 days to 68 days. Although the Defendant Offspring were born while in custody of a U.S. Marshals Service contractor, the Defendant Offspring were bred as part of Benefield's dog fighting activity and for the purpose of having the animals participate in an animal fighting venture (*i.e.*, a fight to be conducted). *See generally supra* ¶¶

36–41; *infra* ¶72(e).  As previously mentioned, dogfighters, breeders, and trainers, often develop and maintain a stock of dogs to increase the odds of having a fighting dog with the necessary traits to win an illegal dog fight.

vi. ***Benefield's Phone Contained Evidence of his Knowledge and Involvement in Dog Fighting Ventures***

72.     Also on or about January 14, 2025, law enforcement seized Benefield's phone ("Phone 1"). A review of Phone 1's contents revealed that Benefield used Phone 1 to document and support his dog fighting venture. Among other items, Phone 1 contained the following:

a.      a video recording, last modified on or about January 21, 2024, that depicts a black dog standing over a dead brown dog in which Benefield can be heard complaining that no one had alerted him that the black dog had killed and eaten the other dog;

b.      a video recording, last modified on or about February 26, 2024, that depicts a chained brown dog on a Weslo treadmill in which Benefield is heard telling the barking dog to "hush";

c.      a video recording, last modified on or about July 8, 2024, that depicts a black dog and a brown dog in a caged area engaged in a fight, in which Benefield can be heard in the background;

d.      a video recording, last modified on or about August 8, 2024, that depicts a brown dog chained to one arm of a carpet mill chasing a racoon attached to another arm of the mill; and

e.      a note titled "Dogs," created on or about October 7, 2020, and last

modified on or about October 8, 2024, tracking dog pedigrees, *e.g.*, stating, "Blue china had 6 puppies from Capone 10/21/23" and "Lil china had 8 puppies frm ch wild man 10/7/2024." As previously noted in paragraph 41(c), Benefield told a CHS about a dog named Capone.

73.     Additionally, in a text conversation, Benefield ordered and paid for dog medication from an individual listed as "Big Don," who asked for payment via CashApp. In the text conversation, on or about February 2, 2024, Big Don sent Benefield, an image of a receipt for a shipment from Houston, Texas to Deerfield Beach, Florida with the message, "We at a total of 500[.]" CashApp records from Block, Inc., a California-based company, confirmed that Benefield made peer-to-peer payments on or about February 10, 13, and 27, 2024, that totaled $500.00 to a single recipient.

## IV.   BASIS FOR FORFEITURE

74.     Any animal involved in a violation of 7 U.S.C. § 2156 is subject to civil forfeiture. *See* 7 U.S.C. § 2156(e).

75.     Specifically, the Animal Welfare Act at § 2156(e) provides that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of [Section 2156] may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." Animals "seized under such warrant shall be held by the United States marshal or other authorized person

pending disposition thereof by the court in accordance with this subsection." *Id.*

Moreover,

> [a]ny animal involved in any violation of [Section 2156] shall be liable to
> be proceeded against and forfeited to the United States at any time on
> complaint filed in any United States district court or other court of the
> United States for any jurisdiction in which the animal is found and upon
> a judgment of forfeiture shall be disposed of by sale for lawful purposes
> or by other humane means, as the court may direct.

*Id.* The costs incurred in caring for animals seized and forfeited under Section 2156

"shall be recoverable from the owner of the animals (1) if he appears in such forfeiture

proceeding, or (2) in a separate civil action brought in the jurisdiction in which the

owner is found, or transacts business." *Id.*

76.     It is a violation of 7 U.S.C. § 2156 for any person to knowingly sell, buy,

possess, train, deliver, or receive any animal for the purposes of having the animal

participate in an animal fighting venture. *See* 7 U.S.C. § 2156(b).

77.     An "animal fighting venture" is defined as "any event, in or affecting

interstate or foreign commerce, that involves a fight conducted or to be conducted

between at least 2 animals for purposes of sport, wagering, or entertainment . . . ."

7 U.S.C. § 2156(f)(1).

78.     Pursuant to 7 U.S.C. § 2156(f)(2), "instrumentality of interstate

commerce" means any written, wire, radio, television, or other form of communication

in, or using a facility of, interstate commerce.


[SPACE INTENTIONALLY LEFT BLANK]

## FIRST CLAIM
**Animals Involved in a Violation of 7 U.S.C. § 2156(b) (Training)**
**7 U.S.C. § 2156(e)**

79.     The factual allegations in paragraphs 1 through 78 are hereby re-alleged and incorporated by reference as if fully set forth herein.

80.     As set forth above, Benefield trained the Defendant Fighting Dogs, that is USM-1937 through USM-1972, for purposes of having them participate in an animal fighting venture (*i.e.*, a dogfighting event conducted or to be conducted), in violation of 7 U.S.C. § 2156(b).

81.     Accordingly, the Defendant Fighting Dogs are subject to forfeiture, pursuant to 7 U.S.C. § 2156(e), because they are animals involved in violations of the animal fighting venture prohibition of the Animal Welfare Act, 7 U.S.C. § 2156.

## SECOND CLAIM
**Animals Involved in a Violation of 7 U.S.C. § 2156(b) (Possession)**
**7 U.S.C. § 2156(e)**

82.     The factual allegations in paragraphs 1 through 78 are hereby re-alleged and incorporated by reference as if fully set forth herein.

83.     As set forth above, Benefield possessed the Defendant Dogs, that is USM-1937 through USM-1972, including Defendant Offspring USM-1964A through USM-1964L, for purposes of having them participate in an animal fighting venture (*i.e.*, a dogfighting event conducted or to be conducted), in violation of 7 U.S.C. § 2156(b).


[SPACE INTENTIONALLY LEFT BLANK]

84.     Accordingly, the Defendant Dogs are subject to forfeiture, pursuant to 7 U.S.C. § 2156(e), because they are animals involved in violations of the animal fighting venture prohibition of the Animal Welfare Act, 7 U.S.C. § 2156.

**WHEREFORE**, Plaintiff, the United States of America, requests that the Clerk of the Court issue a warrant for the arrest *in rem* of the Defendant Dogs; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Dogs; that the Defendant Dogs be forfeited and condemned to the United States of America; and for such other and further relief as may be deemed just, necessary and proper.

Respectfully submitted,

**JASON A. REDING QUIÑONES**
**UNITED STATES ATTORNEY**

By:     /s/ *Mitchell E. Hyman*
        Mitchell Evan Hyman
        Assistant United States Attorney
        Florida Bar No. 125405
        United States Attorney's Office
        99 N.E. 4th Street, 7th Floor
        Miami, Florida 33132
        Telephone: (305) 961-9283
        Email: Mitchell.Hyman@usdoj.gov

## **VERIFICATION**

I, Hunter Sargent, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers and witnesses, as well as my investigation of this case, together with others, as a Special Agent with the FBI.

Executed on this ___1___ day of December 2025.

Hunter Sargent, Special Agent
Federal Bureau of Investigation